In re CALDOR, INC.—NY, The Caldor Corporation, Caldor, Inc.—CT, et al., Debtors.

**The CALDOR CORPORATION, Plaintiff,**

v.

**S PLAZA ASSOCIATES, L.P., Defendant.**

**Bankruptcy No. 95 B 44080 JLG. Adversary No. 97/8832A.**

United States Bankruptcy Court, S.D. New York.

Jan. 30, 1998.

Reisman, Peirez, Reisman & Calica, L.L.P., Garden City, NY, for S Plaza Associates, L.P.

Camhy, Karlinsky & Stein, L.L.P., New York City, for Caldor Corporation.

## DECISION ON MOTION OF S PLAZA ASSOCIATES, L.P. TO COMPEL ARBITRATION OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND CROSS–MOTION OF CALDOR CORPORATION FOR SUMMARY JUDGMENT

JAMES L. GARRITY, Jr., Bankruptcy Judge.

The Caldor Corporation ("Caldor") commenced this adversary proceeding to recover $702,285, plus prejudgment interest, representing its alleged overpayment to S Plaza Associates, L.P. ("S Plaza") and its predecessor-in-interest, Garden City Shopping Associates ("Shopping Associates"), of Additional Rent (as defined below) under a lease of nonresidential real property. S Plaza seeks an order (i) staying this adversary proceeding on the grounds that the dispute presents an arbitrable controversy, (ii) authorizing and directing the parties to proceed with arbitration as the lease allegedly requires, (iii) granting it relief from the automatic stay pursuant to § 362(d) of the Bankruptcy Code for that purpose, or (iv) alternatively, pursuant to Fed.R.Bankr.Proc. 7056 and Fed. R.Civ.P. 56, granting it summary judgment dismissing the adversary proceeding on the merits. Caldor opposes the motion and cross-moves for summary judgment in the amount of the alleged overpayments. We deny Plaza's motion for a stay of this proceeding, but we grant it summary judgment dismissing Caldor's complaint. We deny Caldor's cross-motion for summary judgment.

### Facts

Unless noted otherwise, the relevant facts are not in dispute. On September 18, 1995, Caldor and nine of its subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, they re-main in possession of their assets as debtors in possession.

On May 9, 1986, Caldor, Inc. and Shopping Associates, as predecessors-in-interest to Caldor and S Plaza, respectively, entered into a lease (as amended, the "Lease") of a portion of a shopping center in Garden City, New York (the "Shopping Center"). In or about April 1990, Caldor, Inc. assigned its interest in the Lease to Caldor, which has occupied the leased premises since on or about October 15, 1990. Later, Shopping Associates surrendered a deed-in-lieu of foreclosure for the Shopping Center to Marine Midland Bank. In December 1994, S Plaza purchased the property from the bank and, pursuant to an Assignment and Assumption of Lease dated December 7, 1994 (the "Lease Assignment"), S Plaza assumed all of Shopping Associates' rights and obligations thereunder.

The Shopping Center contains 195,871 square feet of leasehold floor area. Caldor presently leases approximately 123,070 square feet. It accumulated that space as follows:

(a) 86,200 square feet on the ground floor and 3,300 square feet on the mezzanine via the Lease;

(b) 10,000 square feet added via a May 1991 amendment to the Lease;

(c) a total of 26,460 square feet added via an April 1993 amendment to the Lease (26,100 square feet) (the "April 1993 Amendment") and an August 1993 amendment to the Lease (360 square feet) (the "August 1993 Amendment"); and

(d) 410 square feet via a December 1993 amendment to the Lease (the "December 1993 Amendment", and together with the April 1993 Amendment and the August 1993 Amendment, the "1993 Amendments").

Under the Lease, Caldor pays a percentage of the Shopping Center's real estate taxes as additional rent (the "Additional Rent"). Caldor contends that the methodology for calculating the Additional Rent payable on the 96,200 square feet of space that Caldor acquired prior to the 1993 Amend-

ments (the "Demised Premises") differs from that used in calculating the Additional Rent payable on the 26,870 square feet of space that Caldor acquired pursuant to the 1993 Amendments (the "New Space").

Caldor contends that paragraphs 10(A) and 9(F) of the Lease govern the calculation of Additional Rent payable on the Demised Premises. Paragraph 10(A) of the Lease states:

> In the first twelve (12) months of the term hereof, Tenant shall pay to Landlord as additional rent, a sum equal to the product of $1.75 multiplied by the number of square feet of floor area within the demised premises ("Base RE Tax"). Landlord, within thirty (30) days of its receipt, shall submit to Tenant the tax bill evidencing the actual real estate taxes for the first full assessment of the Premises ("First Year RE Tax"). For each year thereafter, Tenant shall pay to Landlord for said year, as additional rent:
>
> (i) a sum equal to the product of Tenant's Fraction multiplied by the increase if any, in the real estate taxes for said year over the First Year RE Tax; plus
>
> (ii) the Base RE Tax.

Lease ¶ 10(A). For these purposes, the term "Tenant's Fraction" means

> that fraction the numerator of which shall be the number of square feet of floor area within the demised premises and the denominator of which shall be the number of floor area within all the buildings in the Shopping Center. Floor area of mezzanines shall be counted. As the number of square feet of floor area may change during any year, Tenant's Fraction may change during said year, and the amount payable by Tenant for said year pursuant to the provisions of this Section (F) shall reflect such changes in square footage.

*Id.* ¶ 9(F).

In substance, Caldor argues that those provisions dictate that for any year *after* the year in which the First Year RE Tax is assessed, Caldor will pay Additional Rent for the Demised Premises equal to (i) its Fraction (49.11%, representing the area of the Demised Premises (96,200 sq. ft.) divided by the total area of the Shopping Center (195,-871 sq. ft.)) multiplied by the amount of any increase in real estate taxes attributable to the Shopping Center over the First Year RE Tax, plus (ii) the Base RE Tax ($168,350, representing the area of the Demised Premises (96,200 sq. ft.) × $1.75).

Pursuant to the April 1993 Amendment, Caldor acquired an additional 26,100 square feet of space in the Shopping Center and the parties added a new Section (H) to Article 10 of the Lease, as follows:

> (H) Tenant shall pay to Landlord as additional rent a sum equal to the product of Tenant's Additional Fraction multiplied by the real estate taxes on the Shopping Center. Tenant's Additional Fraction shall have the same meaning as in Article 9(G). Said additional rent for any fraction of a month at the Additional Space Rent Commencement Date and/or termination of the term of this Lease shall be prorated. The payments to be made by Tenant pursuant to this Article 10(H) are in addition to the payments to be made pursuant to the provisions of Article 10(F).

April 1993 Amendment ¶ 3(g). For these purposes, the term "Tenant's Additional Fraction" means

> that fraction, the numerator of which shall be 26,100 and the denominator of which shall be the number of square feet of floor area within all buildings in the Shopping Center. Floor area of mezzanines shall be counted. As the number of square feet of floor area may change during any year, Tenant's Additional Fraction may change during said year, and the amount payable by Tenant for said year pursuant to the provisions of this Section (G) shall reflect such changes in square footage.... The payments to be made by Tenant pursuant to this Article 9(G) are in addition to the payments to be made pursuant to the provisions of Article 9(F).

*Id.* ¶ 3(f). For Caldor, that amendment dictates that S Plaza calculate the Additional Rent Caldor must pay on the New Space as its *pro rata* share of the total tax assessed on the New Space in a given year. For example, for the period commencing December 1, 1993 and continuing to present, the Addition-

al Fraction is 13.72% (26,870 square feet divided by 195,871 square feet).

Caldor maintains that S Plaza and Shopping Associates have incorrectly calculated and billed its Additional Rent since October 1991. Caldor contends that rather than calculating the Additional Rent pursuant to the formula contained in the Lease, they calculated it as if Caldor were a "net lessee" and charged it Additional Rent in direct proportion to the percentage of the Shopping Center it occupies. Caldor says that it did not discover its error until early 1997. It contends that Shopping Associates and S Plaza overbilled it for Additional Rent, as follows:

| PERIOD | BILLED BY LANDLORD/PAID BY CALDOR | CORRECT AMOUNT | OVERPAYMENT DUE CALDOR |
|---|---|---|---|
| 10/15/91—12/31/91 | $146,923 | $ 35,976 | $110,947 |
| 1992 | $229,092 | $172,513 | $126,579 |
| 1993 | $351,275 | $244,281 | $106,994 |
| 1994 | $456,413 | $317,356 | $141,057 |
| 1995 | $404,194 | $316,111 | $ 88,083 |
| 1996 | $551,850 | $421,224 | $130,625 |

S Plaza filed a proof of claim herein in the amount of $246,400.32 for rent and Additional Rent under the Lease. In August of 1997, Caldor commenced this adversary proceeding seeking repayment of the alleged overpayments on theories of unjust enrichment, breach of contract and tortious conversion. S Plaza admits that the landlords have billed Caldor for the Additional Rent as a "net lessee" and does not dispute Caldor's calculation of the alleged overpayments. However, in its answer to Caldor's complaint, it denies liability and asserts six affirmative defenses.

### Discussion

We have subject matter jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.).

As a threshold matter, S Plaza contends that this adversary proceeding is a non-core proceeding because it arises out of alleged pre-petition Lease defaults and alleged overpayments, and the merits are strictly governed by dispositive principles of New York law. S Plaza is correct that Caldor is seeking to redress alleged pre-petition wrongs and that New York law governs the substantive merits of the parties' claims herein. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re S.E. Nichols, Inc.,* 120 B.R. 745 (Bankr.S.D.N.Y.1990) (pre-petition lease agreements are to be construed in accordance with applicable state law); *In re Emilio Cavallini, Ltd.,* 112 B.R. 73 (Bankr.S.D.N.Y.1990) (same). However, it does not follow that this is a non-core proceeding.

Under 28 U.S.C. § 157(b)(1), we "may hear and determine all ... core proceedings arising under title 11 ... and may enter appropriate orders and judgments, subject to review under [28 U.S.C. § 158]." Section 157(b)(2) contains a non-exclusive list of "core proceedings". *See* 28 U.S.C. § 157(b)(2).[1]

1. 28 U.S.C. § 157(b)(2) provides as follows:
 Core proceedings include, but are not limited to—
 (A) matters concerning the administration of the estate;
 (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
 (C) counterclaims by the estate against persons filing claims against the estate;
 (D) orders in respect to obtaining credit;
 (E) orders to turn over property of the estate;
 (F) proceedings to determine, avoid, or recover preferences;
 (G) motions to terminate, annul, or modify the automatic stay;

Caldor claims that this is a core proceeding under §§ 157(b)(2)(A), (B), (C), (E) and/or (O) because: (i) it focuses on the extent of Caldor's property; (ii) it concerns the administration of the estate, such as S Plaza's claim filed herein and Caldor's intended objection thereto; (iii) the resolution of this dispute is an adjustment of the debtor-creditor relationship; (iv) hybrid matters involving pre-petition contracts and post-petition claims (such as Caldor's continued overpayment of additional rent post-petition) are core proceedings; (v) it involves the allowance or disallowance of S Plaza's claim and Caldor's anticipated objection to it; (vi) it involves the determination of a related counterclaim, and (vii) it is a turnover proceeding to collect property of the estate.

■■■■ A party's characterization of an adversary proceeding within the terms included as core in §§ 157(b)(2)(A)–(O) is not dispositive of whether the proceeding is core. *In re General American Communications Corp.*, 130 B.R. 136, 155 (S.D.N.Y.1991) (citing *Taxel v. Commercebank (In re World Financial Services Center, Inc.)*, 64 B.R. 980, 986 (Bankr.S.D.Cal.1986)). Likewise, the fact that the resolution of a dispute may be affected by state law does not alone render the dispute non-core. *See* 28 U.S.C. § 157(b)(3). In determining whether a proceeding is a core proceeding, the relevant inquiry "is whether the nature of th[e] adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power." *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1389 (2d Cir.1990).

S Plaza cites *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.1993), *cert. dismissed,* 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994), and "similar authorities" to support its assertion that this is not a core proceeding. In *Orion,* a chapter 11 debtor-in-possession ("Orion"), sued Showtime Networks, Inc. ("Showtime") alleging that Showtime had anticipatorily breached a pre-petition licensing agreement. In its amended complaint, Orion sought (i) an order authorizing assumption of the agreement under § 365 of the Bankruptcy Code, (ii) an order directing Showtime to pay the amounts provided under the agreement, and (iii) a declaration that Showtime was estopped from invoking the "key men" clause of the agreement. *See In re Orion Pictures Corp.*, 139 B.R. 785, 786 (S.D.N.Y.1992). In a separate motion, Orion also sought to assume the agreement. Showtime moved to withdraw the reference of the adversary proceeding from the district court. The district court denied the motion, finding in accordance with its previous decision in *Silverman v. U.W. Marx, Inc. (In re Leco Enterprises, Inc.)*, 125 B.R. 385 (S.D.N.Y.1991), that an action commenced by a debtor to collect contract claims owing to it "is a core proceeding within the plain meaning of 28 U.S.C. § 157(b)(2)(A)". 139 B.R. at 788. Showtime answered the amended complaint and demanded a jury trial, which the bankruptcy court denied. Thereafter, the bankruptcy court held a hearing on both the motion to assume and the adversary proceeding. In deciding the motion to assume, the bankruptcy court found that Orion had not breached the "key men" clause in the agreement and, in light of that determination, granted the motion. Thereafter, the court dismissed the adversary proceeding without prejudice, as moot. On appeal, the district court affirmed. *See In re Orion Pictures Corp.*, 149 B.R. 342 (S.D.N.Y.1992). On appeal, the Second Circuit vacated the

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2).

judgment, holding, among other things, that the district court erred in denying Showtime's motion to withdraw the reference and misplaced its reliance on *Leco Enterprises:*

The problem with the *In re Leco* approach is that it creates an exception to *Marathon* that would swallow the rule. Any contract action that the debtor would pursue against a defendant presumably would be expected to inure to the benefit of the debtor estate and thus "concern[s]" its "administration." Certainly this is true here where the outcome could determine Orion's continued viability as an enterprise. Nonetheless, the Adversary Proceeding remains a pre-petition contract action that the Supreme Court held in *Marathon* may not be finally adjudicated by a non-Article III judge.

4 F.3d at 1102 (citations omitted).

■ In substance, in this adversary proceeding, Caldor is objecting to S Plaza's claim for pre-petition rent and asserting a counter-claim for the alleged overpayments. As a general rule, claims objections are contested matters, not adversary proceedings. *See* Fed.R.Bankr.Proc. 3007. Caldor's use of an adversary proceeding to press its claim against S Plaza is appropriate here because a claim objection coupled with counterclaims seeking affirmative relief is treated as an adversary proceeding. *See id.*

■ S Plaza misplaces its reliance on *Orion.* This is a core proceeding because unlike Showtime, S Plaza subjected itself to our core jurisdiction by filing a proof of claim. *See 176–60 Union Turnpike v. Howard Beach Fitness Ctr., Inc.,* 209 B.R. 307, 311 (S.D.N.Y.1997) (where creditor files proof of pre-petition contract claim arising under state law against debtor, bankruptcy court has "core" jurisdiction to determine that claim pursuant to 28 U.S.C. § 157(b)(2)(B)); *In re Leslie Fay Cos., Inc.,* 181 B.R. 156, 159 (Bankr.S.D.N.Y.1995) (power to allow or disallow claims includes " 'full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or claim against the estate is based' ") (quoting *Lesser v. Gray,* 236 U.S. 70, 74, 35 S.Ct. 227, 228, 59 L.Ed. 471 (1915)). It is also a core proceeding under § 157(b)(2)(C) be-

cause Caldor's claims against S Plaza are the equivalent of counterclaims against an entity that has filed a claim against the estate. *See In re Springer–Penguin, Inc.,* 74 B.R. 879, 882 (Bankr.S.D.N.Y.1987); *accord Lombard–Wall, Inc. v. N.Y.C. Hous. Dev. Corp. (In re Lombard–Wall, Inc.),* 48 B.R. 986, 990 (S.D.N.Y.1985) (proof of claim and adversary proceeding are "logically connected" where both involve interpretation of same contract and both arise out of the same transaction so that judicial economy and fairness dictate that both be adjudicated in the same forum).

### The Lease's Arbitration Provision

■ The Federal Arbitration Act provides in relevant part as follows:

[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ...

9 U.S.C. § 3; *see also* 9 U.S.C. § 4 (providing that any party aggrieved by the alleged refusal of another to arbitrate under a written arbitration agreement may petition a federal district court for an order compelling arbitration). There is a strong policy favoring arbitration as a means of dispute resolution. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Doctor's Associates, Inc. v. Distajo,* 107 F.3d 126 (2d Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997); *Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42 (2d Cir. 1993); *Allegaert v. Perot,* 548 F.2d 432, 437 (2d Cir.1977), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977).

S Plaza contends that we must compel Caldor to arbitrate this dispute because:

(a) Caldor agreed to arbitrate rent disputes in ¶ 34 of the Lease;

(b) the dispute arises out of alleged pre-petition Lease defaults and alleged overpayments of substantial pre-petition Lease sums;

(c) controlling principles of New York State law govern the substantive merits of Caldor's and S. Plaza's claims relating to the parties' pre-petition dealings;

(d) neither this case nor Caldor's estate will be prejudiced or otherwise suffer hardship, disruption or financial strain if we direct Caldor to arbitrate this dispute; and

(e) the arbitrators are fully capable of rendering a timely decision and award herein based upon this summary judgment record because it is settled that summary judgment is a sanctioned and enforceable remedy in arbitration.

Caldor contends that because its lease relationships are central to its reorganization, if we direct the parties to arbitrate this dispute we will interfere with fundamental purposes of the Bankruptcy Code, including the restructuring of the debtor-creditor relationships, equitable distribution and administration of the estate, and centralization of dispute resolution in one forum. It further argues that we should deny S Plaza's request for arbitration because (i) this is a core proceeding, (ii) the special expertise of an arbitrator is not necessary to resolve the dispute herein, (iii) resolution of this dispute will impact on other creditors who are not parties to an arbitration agreement, and (iv) the dispute involves significant estate assets and affects estate property. It also contends that because the resolution of this dispute and S Plaza's proof of claim both involve the interpretation of the Lease, it is more economical and expeditious to have those matters decided in this court, especially since the parties' summary judgement motions are before us.

S Plaza is correct that in ¶ 34 of the Lease, the parties agreed to arbitrate rent disputes. That paragraph states:

Every matter in this lease specifically made subject to determination by arbitration, as well as any dispute between Landlord and Tenant concerning any of the provisions of Sections (J) and (K) of Article 5, Sections (D), (E) and (H) of Article 9, all Sections of Articles 10, 11, 15 and 16 hereof and the provisions of Exhibit B and/or the plans and specifications referred to therein shall be submitted to arbitration in the County of Nassau, State of New York....

Lease ¶ 34. Moreover, as previously noted, it is correct that the dispute arises out of alleged pre-petition Lease defaults and that New York law governs the substantive merits of the parties' claims. Finally, there is no dispute that summary judgment is an enforceable remedy in arbitration and there is no evidence that Caldor will suffer hardship, disruption or financial strain if we direct it to arbitrate this dispute.

█ Nonetheless, we retain broad discretion to determine whether to enforce a valid arbitration agreement. *BNY Licensing Corp. v. Isetan of Amer. (In re Barney's, Inc.),* 206 B.R. 336, 343 (Bankr.S.D.N.Y. 1997); *United States Lines v. Amer. S.S. Owners Mut. Protection Indem. Ass'n (In re United States Lines, Inc.),* 199 B.R. 465, 475 (S.D.N.Y.1996); *In re Spectrum Information Technologies, Inc.,* 183 B.R. 360, 363 (Bankr. E.D.N.Y.1995). The strong federal policy favoring rigorous enforcement of arbitration clauses may be overridden "by a countervailing policy manifested in another federal statute." *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985). The Bankruptcy Code is such a federal statute. *See, e.g., Zimmerman v. Continental Airlines, Inc.,* 712 F.2d 55, 59 (3d Cir.1983) ("because of the importance of bankruptcy proceedings in general, and the need for expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the [Bankruptcy Code] is read to impliedly modify the [Federal] Arbitration Act"), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *In re Chas. P. Young Co.,* 111 B.R. 410, 416–18 (Bankr. S.D.N.Y.1990); *Double TRL, Inc. v. F.S. Leasing, Inc. (In re Double TRL, Inc.),* 65 B.R. 993, 998 (Bankr.E.D.N.Y.1986). The strength of that countervailing policy and, thus, our discretion not to give effect to a

valid arbitration clause, largely depend on whether we have core jurisdiction to adjudicate the claims that S Plaza seeks to arbitrate. *See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1157 (3d Cir.1989); *United States Lines*, 199 B.R. at 474; *Spectrum Information*, 183 B.R. at 363.

■ This dispute is within our core jurisdiction.[2] We agree with Caldor that the dispute implicates important aspects of the Bankruptcy Code and significant estate assets and does not warrant the special expertise of an arbitrator. Accordingly, we deny S Plaza's request to compel arbitration of the dispute herein. *See Springer–Penguin*, 74 B.R. at 882 (refusing to abstain in favor of foreign arbitration where resolution of objection to claim was core proceeding); *Double TRL*, 65 B.R. at 998 (denying motion to abstain from hearing core turnover proceeding in favor of arbitration where controversy concerning sales agreement did not require special expertise of arbitrators, where fair resolution of dispute dictated that complete record be maintained and that findings and conclusions be made by tribunal, and where members of arbitration committee had been unable to resolve ongoing disputes between parties for two years); *see also In re Barney's*, 206 B.R. at 343 (even if arbitration clause could be construed to cover dispute, court would not stay core adversary proceeding seeking avoidance of liens and transfers, a declaration that assets constituted estate property and turnover of property).

### *The Cross–Motions for Summary Judgment*

In late 1991 and early 1992, Shopping Associates, or its agent, The Feldman Realty Group Ltd. ("Feldman"), and Caldor, or its real estate tax consultant, Management Associates, Inc. ("Management Associates"), exchanged four letters (the "Correspondence") regarding Caldor's obligations to pay Additional Rent under the Lease and the appropriate computation thereof. By letter dated December 13, 1991, Feldman invoiced Caldor, Inc. for Additional Rent as follows:

> Based on the tax bills for the property in question, we have determined that the property sustained a real estate tax obligation of $366,210.16 for School Tax for the period 7/1/91 through 6/30/92, and a General Tax obligation of $241,847.91 for the period 1/1/91 through 12/31/91. Prior to this billing, you had already paid your tax obligation through the period 10/15/91. Therefore, the enclosed billing was calculated from the period 10/15/91 through 6/30/92 for School Tax, and the period 10/15/91 through 12/31/91 for General Tax.

> Since your store premises represents 44.76% of the property in question, we have determined that your proportionate share of these taxes is $149,460.65, as per the enclosed Invoice. In this regard, attached hereto, please find our Invoice, showing our calculations and breakdown together with supporting documentation.

In a January 13, 1992 letter, Management Associates advised Feldman, among other things, that it had miscalculated the Additional Rent in the December 13 invoice because Shopping Associates based its calculation upon Caldor's proportionate share of the real estate taxes, rather than an increase over the base year rent of $1.75 per square foot. Feldman responded to Management Associates by letter dated January 27, 1992. Therein, Feldman challenged S Plaza's methodology for calculating Additional Rent:

> We take issue with the statement in your letter of January 13, 1992, that the Lease Agreement calls for a tax payment over the base of $1.75 per square foot. On the contrary, the $1.75 per square foot was just the limitation on the Tenant's tax contribution for the first lease year. Thereafter, the Tenant is required to pay the $1.75 per square foot plus its proportionate share of the taxes in excess of that figure. The same result is achieved arithmetically by having the Tenant pay its proportionate share of the tax bills in question.

**2.** For that reason, *Hays & Co.*, 885 F.2d at 1157, and the other authorities cited by Plaza for the proposition that a bankruptcy court lacks discretion to deny the effect of a valid arbitration clause in a non-core case are inapposite.

Management Associates replied to Feldman by letter dated March 16, 1992. In addition to asserting that Caldor then occupied 44% rather than 44.76% of the Shopping Center, Management Associates advised:

Additionally, we seem to be missing the fact that Caldor has been making payments during 1991 of $37,712.49 on a regular basis, for the period you have been billing them, and this is their base total real estate tax. If we were to take a full year into consideration, the total tax that they would be paying you at $1.75 per square foot, would be $150,850 for the entire year. Your billing is $149,460.65 which is less than the total billing that they are paying as a base year.

As reiterated by your Mr. Feldman, the $1.75 per square foot was to be a base tax and if the taxes were in excess of that number, Caldor would have to pay that amount.

At this point in time, I believe that one of us is confused in our interpretation and that, in fact, if Caldor has been paying you tax at the rate of $1.75 a square foot over a 12 month period of time, they would have paid $150,850.00 and therefore not owe you any additional tax.

Thereafter, Feldman transmitted an amended tax invoice to Caldor in which it calculated the Additional Rent due under the Lease to be 44% of the total general tax bill for the Shopping Center. In the April 13, 1992 cover letter, Feldman advised:

Pursuant to your telephone conversation with Barry Feldman, relative to the real estate tax obligation for Caldor Store # 127 at the above referenced Shopping Center, enclosed herewith, please find amended invoices for the periods 7/1/91 – 6/30/92 (School Tax), 1/1/91 – 12/31/91 (General Tax), and 1/1/92 – 12/31/92 (General Tax). Please note on the 1st invoice, that the tax has been prorated from October 15, 1991. In addition, please note that Caldor's proportionate share has been changed to 44%.

Should you have any questions or comments, please do not hesitate to call our offices. If, however, everything seems in order, we look forward to receiving your

check in the amount of $301,065.42 for the real estate taxes for the periods in question.

Caldor paid the invoice, and continued to pay an amount equal to 44% of the center's general tax bill as Additional Rent under the Lease until 1997—both prior and subsequent to the time that S Plaza succeeded to Shopping Associates' interest in the Shopping Center and the Lease.

When S Plaza acquired the Shopping Center, Caldor executed an estoppel certificate (the "Estoppel Certificate") which provides, in relevant part, that "[t]o the best of Tenant's knowledge, there exists no default or state of facts which with notice, the passage of time, or both, could ripen into a default on the part of the Tenant or Landlord". Estoppel Certificate ¶ 2. In addition, Caldor's tax counsel sought real estate tax abatements with respect to the Shopping Center in each year from 1991 to 1996. All documentation submitted in connection with those proceedings, including the related tax certiorari petitions, incorporated the Additional Rent amounts provided by S Plaza.

S Plaza contends that it is entitled to summary judgment dismissing this Complaint because Caldor acquiesced to Shopping Associates' interpretation of the Lease, and "knowingly and voluntarily" abandoned its contrary construction of the Lease, by paying 44% of the Shopping Center's general tax bill, as Additional Rent, from 1991 through 1996. Further, it maintains that the doctrines of waiver, equitable and promissory estoppel, laches and accord and satisfaction bar Caldor's claims. It also argues that Caldor is not entitled to restitution because it paid the rent under a mistake of law and that, in any event, while S Plaza assumed the prospective obligations of Shopping Associates first arising on or after the date that it acquired the Shopping Center from Marine Midland, it did not assume Shopping Associates' liabilities and specifically, its liability for overbilling Caldor.

Caldor denies that we should dismiss its complaint. It acknowledges the existence of the Correspondence and the Estoppel Certificate, and concedes that for approximately six years it did not detect that it was alleged-

ly overpaying Additional Rent. It denies that it has waived any of its rights to object to the alleged overpayments, and contends that when it executed the Estoppel Certificate, it was not aware of any default by Shopping Associates under the Lease. Caldor asserts that it is entitled to restitution of all of the alleged overpayments from S Plaza because it assumed Shopping Associates' liabilities under the Lease. It also contends that it is entitled to summary judgment on its complaint.

Fed.R.Civ.P. 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). A fact is "material" only if it will affect the outcome of a lawsuit under applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable finder of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Rovtar v. Union Bank of Switzerland,* 852 F.Supp. 180, 182 (S.D.N.Y.1994). In assessing the merits of a summary judgment motion, we must view the record in the light most favorable to the non-moving party. *See, e.g., Nat'l Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989). We must determine " '[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. at 2512); *see also Heyman v. Commerce & Industry Insur. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) ("on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried"). The movant must establish the absence of an issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

S Plaza concedes that the Lease contains broad language that appears to differentiate between "First Year RE Tax" and "Base Year RE Tax". Nonetheless, it argues that the Correspondence evidences that the parties mutually intended to create a "net lease" situation as to real estate taxes to commence after the initial buildout and tax assessments of the leased premises in accordance with the Lease. Thus, S Plaza maintains that we must reject Caldor's contrary interpretation of the Lease as violating settled principles of New York law mandating that we construe leases consistent with the actions taken by the parties to them. Further, it argues that the parties' course of performance is controlling evidence of the proper interpretation of the Additional Rent provisions of the Lease.

S Plaza is correct in its recitation of applicable law. *See, e.g., Old Colony Trust Company v. City of Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913) ("generally speaking, the practical interpretation of a contract by the parties to it for any consideration period of time before it comes to be the subject of controversy is deemed to be of great, if not controlling influence.... Although not strictly such, this rule is sometimes treated as a branch of the law of estoppel"); *accord C & C Blaschka Inc. v. Frazer,* 32 A.D.2d 774, 302 N.Y.S.2d 443, *aff'd,* 30 N.Y.2d 645, 331 N.Y.S.2d 669, 282 N.E.2d 623 (N.Y.1972) ("there is no surer way to find out what parties meant than to see what they have done"). However, those legal principles are not applicable herein.

Under New York law, if the language of an agreement is unambiguous, we determine its meaning as a matter of law on the basis of the agreement alone, without resorting to extrinsic evidence. *See Hickman v. Saunders,* 228 A.D.2d 559, 560, 645 N.Y.S.2d 49, 50 (N.Y.A.D.1996). We consider parol or extrinsic evidence to determine the contracting parties' intent only where the contract is ambiguous. *Id.; accord In re Prudential Lines, Inc.,* 170 B.R. 222, 238 (S.D.N.Y.1994) (where insurance contract ambiguous, properly considered extrinsic evidence of intent "includes evidence of the

parties' practice with respect to the contract after its formation"), *appeal dismissed,* 59 F.3d 327 (2d Cir.1995). Caldor denies that the Additional Rent provisions of the Lease are ambiguous and S Plaza does not dispute that assertion. Thus, we reject S Plaza's assertion that the extrinsic evidence is probative of the parties' intent regarding the payment of Additional Rent.

 Waiver is "the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Won's Cards, Inc. v. Samsondale/Haverstraw Equities, Ltd.,* 165 A.D.2d 157, 163, 566 N.Y.S.2d 412 (1991); *accord Central General Hospital v. Chubb Group of Insur. Cos.,* 90 N.Y.2d 195, 201, 659 N.Y.S.2d 246, 681 N.E.2d 413 (1997); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265, *rearg. denied,* 57 N.Y.2d 674, 454 N.Y.S.2d 1032, 439 N.E.2d 1247 (1982). It must be "clear, unmistakable and without ambiguity", *see AFL—CIO v. Kinsella,* 194 A.D.2d 1054, 1055, 599 N.Y.S.2d 671 (1993), and "should not be lightly presumed." *Santamaria v. 1125 Park Avenue Corp.,* 238 A.D.2d 259, 657 N.Y.S.2d 20, 22 (1997). Whether there was a knowing and intentional waiver of rights is a factual question that we determine based on the totality of the circumstances. *People v. Matthews,* 148 A.D.2d 272, 544 N.Y.S.2d 398, *appeal dismissed,* 74 N.Y.2d 950, 550 N.Y.S.2d 285, 549 N.E.2d 487 (1989). It may be accomplished by express agreement or by conduct or a failure to act that evidences an intent not to claim a purported advantage. *Dice v. Inwood Hills Condominium,* 237 A.D.2d 403, 655 N.Y.S.2d 562, 562 (1997).

 S Plaza contends that Caldor waived any right to recover the alleged overpayments by executing the Estoppel Certificate since S Plaza actually and reasonably relied on the representations contained therein when it acquired the Shopping Center. Caldor contends that its mistaken payment of excess Additional Rent cannot constitute a waiver because the Lease contains a non-waiver clause. However, the existence of a non-waiver clause in a contract does not by itself preclude the waiver of a provision

of, or right under, the contract. *TSS–Seedman's, Inc. v. Elota Realty Co.,* 72 N.Y.2d 1024, 1029, 534 N.Y.S.2d 925, 531 N.E.2d 646, *rearg. denied,* 73 N.Y.2d 852, 537 N.Y.S.2d 496, 534 N.E.2d 335 (1988); *Dice,* 655 N.Y.S.2d at 562. Rather, the particular facts and circumstances of a case dictate whether there has been a waiver. *Id.* Caldor also contends that it cannot be deemed to have waived any rights pursuant to the Estoppel Certificate because by its terms the certificate applied only to defaults of which Caldor was aware to the best of its knowledge at the time.

 Waiver is essentially a matter of intention, and for this reason, is generally ill-suited for summary adjudication. *See Won's Cards,* 165 A.D.2d at 164, 566 N.Y.S.2d 412 (denying motion for summary judgment where evidence, including declaration made by plaintiff in estoppel certificate and subordination agreement was subject to differing inferences and did not "directly, unmistakably or unequivocally" establish plaintiff's intentional relinquishment of known right to seek damages for loss of profits caused by continuing breach of exclusive use provision prior to assignment of lease) (citing *Sillman v. Twentieth Century–Fox Film Corp.,* 3 N.Y.2d 395, 403, 165 N.Y.S.2d 498, 144 N.E.2d 387 (1957); *Alsens American Portland Cement Works v. Degnon Contr. Co.,* 222 N.Y. 34, 37, 118 N.E. 210 (1917)). In the Correspondence, Caldor did not accede to S Plaza's Lease interpretation. The fact that Caldor executed the Estoppel Certificate does not preclude it as a matter of law from seeking damages for continuing breaches of the Lease arising prior to the Lease assignment. *Won's Cards,* 165 A.D.2d at 163, 566 N.Y.S.2d 412 (card shop tenant's estoppel certificate and subordination agreement containing tenant's representation that assignor landlords were not in default under any provision of lease and that tenant knew of no event which would constitute default created questions of fact precluding summary judgment on issue whether tenant waived right to damages for continuing breach of exclusive use provision of lease prohibiting landlords from permitting any other premises in mall to be used for sale of greeting cards, gift

items, or stationery). S Plaza is not entitled to summary judgment dismissing the Complaint on the grounds that Caldor waived its right to recover the alleged overpayments.

■ To equitably estop Caldor from asserting its claims, S Plaza must demonstrate that Caldor (i) made a false representation or concealed material facts, (ii) intended that such conduct would be acted upon by S Plaza, and (iii) had knowledge of the true facts. *See Rashbaum v. Tax Appeals Tribunal of State of New York*, 229 A.D.2d 723, 725, 645 N.Y.S.2d 175 (1996) (citing *Matter of Hayden v. S & W Meat & Poultry*, 221 A.D.2d 823, 824–25, 634 N.Y.S.2d 226 (1995); *Matter of Walls v. Levin*, 150 A.D.2d 873, 874, 540 N.Y.S.2d 623 (1989); *Airco Alloys Div. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 81–82, 430 N.Y.S.2d 179 (1980)). S Plaza does not allege that Caldor misrepresented or concealed any material facts, or that Caldor was aware of the real facts; thus, its equitable estoppel argument fails as a matter of law.

■ The doctrine of promissory estoppel may be invoked when the aggrieved party can demonstrate "the existence of a clear and unambiguous promise upon which he or she reasonably relied, thereby sustaining injury". *Steele v. Delverde S.R.L.*, — A.D.2d —, 662 N.Y.S.2d 30, 31 (1997); *Roufaiel v. Ithaca College*, — A.D.2d —, 660 N.Y.S.2d 595, 599 (1997). S Plaza points to the Estoppel Certificate as the basis for its assertion that Caldor is estopped from recovering the alleged overpayments. We disagree that Caldor clearly and unambiguously represented that there were no Lease defaults and as such, this aspect of S Plaza's estoppel argument likewise fails as a matter of law.

■ Pursuant to the equitable doctrine of laches, we may deny relief to a plaintiff who inexcusably and unreasonably delays in seeking relief to the defendant's prejudice. *See Indian Motocycle Associates, Inc. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 157 B.R. 532, 538 (S.D.N.Y.1993); *Matter of Tenace*, 234 A.D.2d 722, 722, 650 N.Y.S.2d 897 (1996). The elements of laches are: (i) conduct giving rise to the situation complained of, (ii) delay by the plaintiff in asserting a claim despite the opportunity to do so, (iii) lack of knowledge on the defendant's part that a claim would be asserted, and (iv) injury or prejudice to the defendant in the event that relief is granted to the plaintiff. *Cohen v. Krantz*, 227 A.D.2d 581, 582, 643 N.Y.S.2d 612 (1996) (citing *Dwyer v. Mazzola*, 171 A.D.2d 726, 727, 567 N.Y.S.2d 281 (1991)); *see also Rapf v. Suffolk County of New York*, 755 F.2d 282, 292 (2d Cir.1985) (setting forth substantially same standard under federal law); *In re John's Meat Emporium, Inc.*, 176 B.R. 700, 704–05 (Bankr. E.D.N.Y.1995) (same). Laches is a defense against claims in equity, not at law. *See Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 704 (S.D.N.Y.1996) (claim by corporation which edited scientific journals that publisher failed to make payments allegedly due under the contract was claim at law, not in equity, and could not be barred by laches). Thus, where a statute of limitations governs a particular claim, the equitable remedy of laches cannot bar plaintiff's recovery on that claim. *See Ecumenical Task Force of the Niagara Frontier, Inc. v. Love Canal Area Revitalization Agency*, 179 A.D.2d 261, 265, 583 N.Y.S.2d 859 (1992) (citing *Galway v. Metropolitan E.R. Co.*, 128 N.Y. 132, 147, 28 N.E. 479 (1891); *Brown v. Lockwood*, 76 A.D.2d 721, 729, 432 N.Y.S.2d 186 (1980); *Bohemian Brethren Presbyt. Church v. Greek Archdiocesan Cathedral of Holy Trinity*, 94 Misc.2d 841, 845–846, 405 N.Y.S.2d 926 (Sup.Ct.1978), *aff'd*, 70 A.D.2d 538, 416 N.Y.S.2d 751 (N.Y.A.D.1979)), *appeal denied*, 80 N.Y.2d 758, 589 N.Y.S.2d 309, 602 N.E.2d 1125 (1992); *Gonzalez v. Chalpin*, 159 A.D.2d 553, 555, 552 N.Y.S.2d 419, *aff'd*, 77 N.Y.2d 74, 564 N.Y.S.2d 702, 565 N.E.2d 1253 (1990); *International Ass'n of Machinists and Aerospace Workers (IAM) by Winpisinger v. Allegis Corp.*, 144 Misc.2d 983, 988, 545 N.Y.S.2d 638 (Sup.Ct.1989).

■ That is the situation here. There is a six year statute of limitation governing Caldor's breach of contract and unjust enrichment claims. *See* N.Y.C.P.L.R. 213[2] (6 year statute of limitations for breach of contract action); *Congregation Yetev Lev*

*D'Satmar, Inc. v. 26 Adar N.B. Corp.,* 192 A.D.2d 501, 503, 596 N.Y.S.2d 435 (1993) (6 year statute of limitations for unjust enrichment action). There is a three year statute of limitations applicable to its action for tortious conversion of property. *See* N.Y.C.P.L.R. 214[3]. Caldor filed its complaint in July of 1997 to recover excess rent payments made beginning in October 1991 and continuing until December 31, 1996. Thus, Caldor's claims for breach of contract and unjust enrichment are not barred by the doctrine of laches since Caldor commenced this proceeding within the statutory period. However, because Caldor asserted its claim for tortious conversion more than three years after approximately one-half of the alleged excess additional rent payments were made, it cannot recover those alleged overpayments under any theory of tortious conversion because they are time barred. *Cf. Arrathoon v. East New York Savings Bank,* 210 A.D.2d 366, 366, 620 N.Y.S.2d 975 (1994) ("[w]e agree with the defendant's contention that the terms of the lease are controlling, and therefore that it was established that it overpaid rent from the inception of the lease. It is therefore entitled to recover such overpayments (in the amount stipulated to by counsel) as are not barred by the applicable Statute of Limitations") (citations omitted), *appeal denied,* 85 N.Y.2d 806, 627 N.Y.S.2d 322, 650 N.E.2d 1324 (1995).

■ S Plaza maintains that the Correspondence conclusively resolved this Lease dispute. It maintains that we must dismiss the complaint because the claims are barred by closely analogous principles of settlement, accord and satisfaction. The essential elements of an accord and satisfaction are (1) an accord—*i.e.* an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim, and (2) a satisfaction—*i.e.* the execution of that agreement. *Denburg v. Parker Chapin Flattau & Klimpl,* 82 N.Y.2d 375, 383, 604 N.Y.S.2d 900, 624 N.E.2d 995 (1993). The new agreement must be signed by the party against whom it will be enforced, *see* N.Y.G.O.L. § 15–501, and must contain all material elements and be reasonably certain. *Altamuro v. Capoccetta,* 212 A.D.2d 904, 904, 622 N.Y.S.2d 155, *appeal denied,* 85 N.Y.2d 808,

628 N.Y.S.2d 51, 651 N.E.2d 919 (1995). The doctrine clearly does not apply herein because the Correspondence does not contain an unequivocal agreement among the parties to adopt S Plaza's interpretation of the Additional Rent provisions. There was no accord or satisfaction here.

■ Caldor contends that S Plaza is liable for alleged overpayments to Shopping Associates because the Lease states that the "agreements and conditions ... on the part of Landlord to be performed and observed shall be binding upon Landlord and ... its successors and assigns". Lease ¶ 26(A). It also asserts that the record lacks any evidence "unequivocally" establishing that S Plaza did not assume its predecessor's liabilities. We disagree with Caldor's construction of ¶ 26(A) of the Lease. It cannot reasonably be read to include an obligation to refund allegedly excessive rental payments or payments made to a previous landlord. Further, the Lease Assignment, which is part 6 of our record, states that S Plaza "hereby assumes all of the obligations of the landlord under the [Lease] first arising on or after the date hereof." Lease Assignment p. 2. Thus, by its terms, the assignment applies prospectively. Moreover, S Plaza did not assume Shopping Associates' liabilities under the Lease. It merely assumed its "obligations" thereunder. *See Won's Cards,* 165 A.D.2d at 163, 566 N.Y.S.2d 412; *see also Cirfico Holdings Corp. v. GTE Products Corp.,* 99 A.D.2d 939, 472 N.Y.S.2d 631 (1984) (where contract provided for assumption of both obligations and liabilities, court denied plaintiff's summary judgment motion because issue of material fact existed as to scope of liabilities assumed). Thus, by the terms of the Lease Assignment, S Plaza's liability for any alleged breach under the Lease commenced upon the date of the assignment and continues for so long as any such breach continues. *Won's Cards,* 165 A.D.2d at 163, 566 N.Y.S.2d 412 (citing *Bank of New York, Albany v. Hirschfeld,* 37 N.Y.2d 501, 506, 374 N.Y.S.2d 100, 336 N.E.2d 710 (1975)).

Caldor's ipse dixit allegations cannot defeat summary judgment on this point. *See* Fed.R.Civ.P. 56(e) (party opposing summary

judgment "must set forth specific facts showing that there is a genuine issue for trial"); *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (when movant satisfies Rule 56(c), adverse party cannot rely on conclusory allegations to create genuine issue under Rule 56(e)), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991); *Pfau v. Coopers & Lybrand*, 776 F.Supp. 744, 747 (1990) (respondent must do more than simply show that there is some metaphysical doubt as to material facts). Thus, as a matter of law, S Plaza is entitled to judgment dismissing the Complaint.

 An additional basis for denying Caldor restitution and granting summary judgment to S Plaza dismissing the Complaint is that New York law bars Caldor from recovering the alleged mistaken rent payments, since its mistake is a "mistake of law"—*i.e.* whether the Lease required such payments to be made—as opposed to a mistake of fact. *See Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 118 A.D.2d 532, 499 N.Y.S.2d 435 (1986); *Jobco–Mitchel Field, Inc. v. Lazarus*, 156 A.D.2d 426, 548 N.Y.S.2d 700 (1989); *see also Adrico Realty Corp. v. City of New York*, 250 N.Y. 29, 164 N.E. 732 (1928); *Flynn v. Hurd*, 118 N.Y. 19, 22 N.E. 1109 (1889). In *Gimbel Bros.*, Gimbels sought a declaratory judgment that it could properly set off approximately $20,000 in "Sunday charges" that it had paid against future rents due under a lease with Brook Shopping Centers, Inc. for certain premises in the Cross County Shopping Center in Yonkers, New York. Although it had no duty to do so under its lease, Gimbels paid those charges, which were assessed as fees for opening the store on Sundays, to both Brook and the previous landlord from January of 1977 through June of 1978. 118 A.D.2d at 533, 499 N.Y.S.2d 435. Gimbels claimed that it was entitled to restitution of the charges because they were made pursuant to a mistake of fact. The court rejected that argument, finding that "the payments of $825 per Sunday for 24 Sundays were made voluntarily, without protest, and that no mistake of fact was involved." *Id.* at 534, 499 N.Y.S.2d 435. It then considered whether Gimbels was entitled to restitution under the theory that such payments were made pursuant to a mistake of law:

It therefore become necessary to consider whether Gimbels should receive restitution of the $19,800 it paid in "Sunday charges" on the ground that those payments were made under a mistake of law (i.e., a mistake regarding Gimbels' contractual duty to pay such charges). The traditional rule is that a voluntary payment made with full knowledge of the facts cannot be recovered because it was made pursuant to a mistake of law.... The harshness of this absolute rule was ameliorated by the enactment of CPLR 3005, which provides that "when relief against a mistake is sought in an action ... such relief shall not be denied merely because the mistake is one of law rather than one of fact." However, in *Mercury Mach. Importing Corp. v. City of New York*, 3 N.Y.2d 418, 429, 165 N.Y.S.2d 517, 144 N.E.2d 400 [ (1957) ], it was held that the foregoing statute "does not require that mistakes of law shall be treated in all instances as though they were mistakes of fact". Clearly, then, a party is not automatically entitled to relief simply because that party acted under a mistake of law (*see, Birchwood Towers # 1 Assoc. v. Haber*, 98 A.D.2d 697, 699, 469 N.Y.S.2d 92 [(1983)]; *Goodison v. Goodison*, 66 A.D.2d 923, 410 N.Y.S.2d 935 [(1978)], *aff'd*, 48 N.Y.2d 786, 423 N.Y.S.2d 922, 399 N.E.2d 952 [(1979)]). We do not believe that the trial court abused its discretion in denying such relief in this case. Indeed, we find that the weight of the evidence supports the conclusion that Gimbels was not operating under an actual mistake of law but, instead, made the subject payments voluntarily, as a matter of convenience, without having made any effort to learn what its legal obligations were.

* * *

Gimbels displayed a marked lack of diligence in determining what its contractual rights were, and is therefore not entitled to the equitable relief of restitution.

*Id.* at 535–36, 499 N.Y.S.2d 435. In *Jobco–Mitchel Field*, the court held that a subtenant was not entitled to restitution of rent

payable under a sublease even though the master lease between the sub-lessor and the county provided that no rent would be payable until certain zoning variances had been granted by the town so that the property could be developed. The court noted that the sub-lease did not contain any such condition, expressly provided that the provisions in the prime lease regarding the commencement date were not applicable to the sub-lease and required the sub-tenant to pursue rezoning diligently. It accordingly found that the two years of "rent" paid by the sub-tenant was actually compensation for the future right to develop the premises upon rezoning, and rejected the sub-tenant's assertion that it was entitled to restitution on the ground that it made mistake of law or fact because it "voluntarily made payments for over two years without any complaint or evident misrepresentation by [the sub-lessor], and it was represented by counsel who had full opportunity to explore the relevant law and to ascertain the facts." 156 A.D.2d at 428, 548 N.Y.S.2d 700. In *Adrico Realty*, the court addressed whether assessments and penalties levied by a municipality in connection with sidewalk repairs could be recovered by the property owner who paid them when it was unclear whether the assessments were legally authorized. After noting the general proposition that voluntary payments made under a mistake of law cannot be recovered, the court found that a triable question of fact existed as to whether the repairs were necessary due to the city's negligence, such that it was error for the lower court to conclude on the evidence before it that the assessment was valid. It further held that if the assessment did prove to be void, the payment made by the landowner to relieve the land of the lien of the assessment was not a voluntary payment, and would therefore be recoverable. 250 N.Y. at 44, 164 N.E. 732. In *Flynn*, the court held that the highway commissioner of a town who mistakenly paid one-half of the cost of certain bridge repairs when the town was only obligated by statute to pay one-third of such costs was not entitled to recover the overpayment from the other towns that participated in the repair project because the plaintiff's error was one of law, not of fact. As noted by the court:

The excessive payment made by the plaintiff was not made at defendant's request. It was not induced by any fraud or improper conduct on the part of the defendant, but, on the contrary, was made with full knowledge of all the facts and circumstances growing out of and connected with the repair of the bridge.

118 N.Y. at 26, 22 N.E. 1109.

Caldor contends that *Gimbel Bros.* and *Jobco–Mitchel Field* are distinguishable because, unlike the tenants in those cases, it did not have full knowledge of the facts. According to Caldor, its professed ignorance of S Plaza's overbilling constitutes a mistake of fact such that it is entitled to restitution of the excess amounts paid. Additionally, Caldor disputes S Plaza's statement of the law in New York, claiming that under the mistaken payment doctrine, even payments made as a result of negligence may be recovered unless the payee has changed its position to its detriment in reliance upon the mistake so that requiring it to refund the money would be unfair. To support its characterization of the law, Caldor relies upon *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991). In that case, the New York State Court of Appeals held that the "discharge for value" rather than the "mistake of fact" doctrine applied to determine whether mistaken wire transfers among several banks could be recovered. In distinguishing between the two, the court emphasized that detrimental reliance is a "requisite factor" of the mistake of fact doctrine. *Id.* at 366, 568 N.Y.S.2d 541, 570 N.E.2d 189; *see also Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704 (1990) (noting that payor must demonstrate detrimental reliance on mistaken transfer to defeat action for restitution under mistaken payment/money had and received action); *Arrathoon*, 210 A.D.2d at 366, 620 N.Y.S.2d 975 (tenant was entitled to restitution of rent overpayments that it made from inception of lease based upon landlord's statements of amount due to extent that any cause of action for return of such payments not barred by applicable statute of limitations) (citing *Manufacturers Hanover*, 160 A.D.2d at 113, 559 N.Y.S.2d

704; *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982); *Gimbel Bros.*, 118 A.D.2d at 532, 499 N.Y.S.2d 435).

These decisions appear to hinge on the distinction between a mistake of fact and a mistake of law. We find *Gimbel Bros.* to be persuasive in illustrating the difference between the two as they apply to payments mistakenly made under a lease. That court held that the Gimbel's mistake regarding its contractual duty to pay Sunday charges was a mistake of law rather than of fact. 118 A.D.2d at 535, 499 N.Y.S.2d 435. It refused to mitigate the apparent harshness of this result in light of its conclusion that "Gimbels displayed a marked lack of diligence in determining what its contractual rights were, and is therefore not entitled to the equitable relief of restitution." *Id.* at 536, 499 N.Y.S.2d 435. We find that same "marked lack of diligence" here. Caldor had six years after its real estate tax agents first raised questions concerning the additional rent calculation to determine its legal and contractual obligations under the Lease. It failed to raise any objection to that calculation until 1997. Caldor does not contend that S Plaza made intentional misrepresentations or committed fraud in calculating the Additional Rent under the Lease. The only reason that Caldor "did not have full knowledge of the facts" in this case is because it made no effort whatsoever to determine what they were until six years after the fact. We accordingly find that Caldor is not entitled to restitution of the overpayments as a matter of law.

### Conclusion

We deny S Plaza's motion for a stay pending arbitration. We grant summary judgment in favor of S Plaza dismissing Caldor's claims. We deny Caldor's cross-motion for summary judgment.

SETTLE ORDER AND JUDGMENT.